## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF OKLAHOMA

SOUTHERN NAZARENE )
UNIVERSITY, a not-for-profit, )
corporation, )
             )     Case No.: 5:25-CV-00802-D
        Plaintiff, )
             )
        v. )     Hon. C.J. DeGiusti
             )
HES FACILITIES MANAGEMENT, )
LLC., a limited liability company, )     **[JURY TRIAL REQUESTED]**
             )
        Defendant. )

## FIRST AMENDED COMPLAINT

**COMES NOW**, the Plaintiff, Southern Nazarene University ("SNU"), by and through the undersigned counsel, and brings this *First Amended Complaint* against Defendant HES Facilities Management, LLC ("HES") and alleges the following claims and supporting facts:

## INTRODUCTION

1.     This action arises out of the environmental misconduct and systemic professional failures of Defendant HES Facilities Management, LLC ("HES"). Entrusted with the maintenance of Southern Nazarene University's ("SNU") historic Bethany, Oklahoma campus, HES abused that trust by applying HYVAR X-L IVM Herbicide ("HYVAR"), a federally restricted-use soil sterilant, or another similar chemical, in direct violation of federal law, Oklahoma statutes, and clear contractual obligations. Applied in areas where its use is expressly prohibited, HYVAR poisoned soil, decimated mature trees

and landscaping, and inflicted lasting damage on the ecological and aesthetic integrity of SNU's campus.

2.      SNU relied on HES's promises of expertise, training, and regulatory compliance in carrying out a high-trust assignment involving hazardous substances. Yet when early signs of turf and tree decline appeared, HES chose concealment over candor. Its on-site director falsely disclaimed knowledge of the cause, while other representatives vaguely referenced a "sterilant" but never disclosed the chemical's identity, risks, or application records. At no point did HES warn SNU that the "sterilant" it had purchased and applied could kill trees or sterilize soil.

3.      Rather than cooperate, HES engaged in months of obfuscation, withholding application logs, failing to produce promised arborist reports, and deflecting direct inquiries. This pattern of nondisclosure was not an innocent oversight: HES repeatedly withheld application logs, later ignored direct inquiries about chemical identity, and concealed facts uniquely within its control, conduct that was at minimum grossly negligent and at worst deliberate concealment.

4.      Only through SNU's own investigation in 2023 and into 2024 did the truth emerge: HYVAR had been unlawfully deployed in landscaped and recreational areas, contrary to federal labeling restrictions, state licensing requirements, and industry standards. By the spring of 2024, the scale of destruction was undeniable, more than fifty mature hardwoods, including commemorative and memorial trees, were dead or in irreversible decline, the soil remained contaminated, and the campus environment was permanently altered.

5.    As a direct and proximate result, SNU has sustained damages in excess of $1,000,000, including removal of hazardous trees, remediation costs, and long-term soil and landscape loss. Because HYVAR's active ingredient persists in the soil for prolonged periods, the damage likely remains ongoing and may prevent successful replanting for years to come.

6.    HES's conduct was not a mere lapse in performance, it was reckless, deceptive, and unlawful. SNU therefore seeks full compensatory and consequential damages, treble statutory damages under 23 O.S. § 72 for the wrongful injury to timber, punitive damages under 23 O.S. § 9.1, and declaratory relief under 28 U.S.C. § 2201 to clarify HES's continuing liability for remediation and disclosure.

## I. JURISDICTION AND VENUE

7.    Plaintiff incorporates by reference all previous paragraphs as though they were set out full herein.

8.    This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a) because the parties are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

9.    Plaintiff SNU is an Oklahoma not-for-profit corporation organized under the laws of Oklahoma with its principal place of business located in Bethany, Oklahoma.

10.    Upon information and belief, Defendant HES is a limited liability company organized under the laws of either Missouri or Tennessee, with its principal place of business located in Knoxville, Tennessee. Further, upon information and belief, none of HES's members are citizens of the State of Oklahoma.

11.     Venue is proper in this district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this district and the property that is the subject of the action is situated herein.

## II. PARTIES

12.     Plaintiff incorporates by reference all previous paragraphs as though they were set out full herein.

13.     Plaintiff SNU is a regionally accredited, private liberal arts university located in Bethany, Oklahoma. Founded in 1899, SNU is affiliated with the Church of the Nazarene, Inc., and has served for over a century as a center of higher learning rooted in Christian values and service.

14.     SNU is the fee simple owner of the real property, landscaping, and green spaces located on its Bethany, Oklahoma campus. The grounds include extensive tree-lined walkways, commemorative gardens, landscaped flowerbeds, a disc golf course, public benches, and a several of memorial and commemorative trees, along with a large central fountain and the iconic "Lamp of Learning." These features contribute to the university's distinct visual character and atmosphere, and serve as daily touchpoints for student life, institutional heritage, and public gatherings.

15.     Defendant HES is a facilities management company which contracted with SNU to provide lawn maintenance and herbicide application services on SNU's campus.

## III. FACTUAL BACKGROUND

16.     Plaintiff incorporates by reference all previous paragraphs as though they were set out full herein.

4

17.    In 2019, SNU entered into a written contract with WFF Facility Services, a predecessor entity who was later merged with or acquired by HES. Exhibit 1; Exhibit 2.

18.    The contract's "Exhibit A-Proposal for Services," which was expressly incorporated into the agreement by the contract's plain terms, provided that WFF would provide groundskeeping services. Exhibit 2.

19.    The "Exhibit A-Proposal for Services," listed WFF's landscaping services, and represented WFF's experience in that space. *Id*.

20.    The "Exhibit A-Proposal for Services" further represented and warranted WFF's training and oversight programs for its employees. *Id*.

21.    Specifically, "Exhibit A-Proposal for Services" represented and warranted that WFF employees received the following training, "Arboriculture training classes, Synthetic surfaces management, Applied ecology, Turf management, Lawn, ornamental, herbicide, pesticide and fertilization application....[and] Training topics include all applicable environmental and safety laws and LEED requirements." *Id*.

22.    Under "Exhibit A-Proposal for Services," WFF affirmatively represented and warranted that it employed or had available for SNU's benefit a grounds expert, irrigation specialist, horticulturist, and arborist who would provide professional advisement and assistance in the management and maintenance of SNU's grounds. *Id.*

23.    "Exhibit A-Proposal for Services" further provided SNU with a list of equipment that would be needed to perform under the contract, included in the list was a Z-Max sprayer and spreader, valued at $12,000 and a photograph of a large custom-built water tank with a hose on a trailer, valued at $2,500. *Id*.

24.    In addition to the contract's "Exhibit A-Proposal for Services," under Section 2.4 of the contract, HES expressly warranted that it would train all personnel in the performance of their duties. Exhibit 2.

25.    Under the terms of the contract, the parties are to apply Oklahoma law. *Id*.

26.    Pursuant to the contract, HES assumed contractual responsibility for applying herbicides in a safe and effective manner, using products appropriate for use in a college campus setting and in accordance with applicable laws, product labeling, and industry standards.

27.    HES acquired WFF and thereafter expressly undertook and performed WFF's obligations under the SNU contract. By doing so, HES manifested its intent to be bound and, in fact, operated as if it were the original contracting party.

28.    Through its course of performance and written communications with SNU, HES expressly agreed to maintain the SNU campus grounds in full compliance with the contract and in accordance with applicable industry and regulatory standards.

29.    By acquiring and succeeding to WFF's contractual position, HES became the legal successor-in-interest under the agreement with SNU. Having accepted the benefits of the contract, including payment, access, and exclusivity, HES is estopped from denying its obligations thereunder.

30.    When HES's performance fell beyond industry standards in September 2022, SNU worked with HES to cure the subpar and unworkmanlike performance. Exhibit 3.

31.    In a letter dated September 8, 2022, SNU gave HES written notice under Section 11 of the contract of its specific deficiencies in groundskeeping and expressly afforded HES the contractual opportunity to cure. *Id.*

32.    At no point in response to that notice did HES dispute its obligation to perform under the agreement, nor did it contend that it was not bound as WFF's successor-in-interest. HES's silence and continued performance confirm its acceptance of the contract's terms and its binding obligations thereunder.

33.    In the mid to late spring, SNU officials began observing damage to portions of the turf at its main campus located at 6729 N.W. 39th Expressway, Bethany, Oklahoma.

34.    SNU officials believed the damage to the grass was likely caused by improper use of pre-emergent or improper use of fertilizer.

35.    In response to the damaged grass, SNU was forced to paint a portion of the turf green for the spring commencement.

36.    On or about June 14, 2023, SNU's Ron Lester ("Mr. Lester"), Executive Director of Facilities Management, received email communication from HES's William Pipp ("Mr. Pipp"), Vice President of Grounds Management, stating that HES had sprayed a weed-control chemical at SNU's football facilities located about a mile west of its main campus. Exhibit 4.

37.    However, in that communication, HES represented that it had not yet sprayed a weed-control chemical on SNU's main campus located at 6729 Northwest 39th Expressway, Bethany, Oklahoma 73008 or its baseball and softball fields, located near the 7500 block of Northwest Expressway in Bethany, Oklahoma. *Id*.

38.    HES further represented that due to forecasted rain, they would hold off on additional spraying, until drier weather was forecasted. *Id*.

39.    These emails expressly referenced the arrival of "the rest of the sterilant" and HES's intent to spray it across areas of the campus, including crack weeds, parking lots, and the athletic complex. *Id*. However, nowhere in these communications did HES disclose the identity of the chemical as HYVAR XL, a federally restricted-use soil sterilant prohibited for use in landscaped and recreational environments. *Id*.

40.    Instead, HES used vague references to "sterilant" while affirmatively assuring SNU that applications would proceed when weather permitted. *Id*.

41.    On or about June 19, 2023, Tracy Jackson, the director of grounds operations for HES at SNU, returned an email from SNU's President, Dr. Keith Newman, in response to the president's concerns over condition of the grounds, including the excessive growing of weeds on campus. Exhibit 5.

42.    In the email thread with President Newman, Mr. Jackson advised that the weeds had become "more resistant", and HES had purchased a sterilant that would last for months, and that the application of the same started on June 19, 2023. *Id*.

43.    Due to HES's later lack of good-faith cooperation and refusal to provide clear records, SNU remains unaware of the exact date on which HES completed its "sterilant" treatment of the campus grounds, but upon information and belief, believes the treatments were completed sometime by the end of June 2023.

44.    In accordance with federal pleading standards, all averments concerning the timing of Defendant's HYVAR applications are expressly subject to amendment. Because

Defendant has failed to produce chemical application logs or other relevant records in good faith, Plaintiff expressly reserves the right to amend any such allegation as discovery progresses and additional evidence regarding the timing of events becomes available.

45.     HES's failure to disclose this basic information has frustrated SNU's ability to assess the scope of contamination, mitigate damages, and comply with any necessary reporting and remediation obligations.

46.     At no point during any of HES's June 2023 email communications with SNU officials did Mr. Jackson or any other representative of HES disclose that the referenced "sterilant" could pose a risk of killing trees or other desirable vegetation. This omission, whether negligent or fraudulent, deprived SNU of the very information needed to investigate and mitigate the damage.

47.     Notwithstanding, by late June and into July 2023, visible damage to turf grass remained from HES's improper practices earlier in the spring.

48.     It was not until approximately early July 2023 that SNU's Ron Lester first observed a few trees on the southeast side of SNU's main campus, near the A.M. Hills dormitory ("Hill dorm") on NW 39th Street, that exhibited some discoloration. He also noted several patches or stripes of grass along sidewalks on the east and southeast portions of campus beginning to yellow.

49.     The observed discoloration was on the grass and tress inconsistent and slight at first.

50.     Specifically, regarding the trees, many leaves remained green while some adjacent leaves exhibited a yellow or brownish discoloration, creating uncertainty as to

whether the condition reflected actual damage or a naturally occurring phenomenon that was transient in nature.

51.     Moreover, because only about five to six trees near the Hills dorm were exhibiting discoloration while the rest of the campus trees appeared unaffected, Mr. Lester could not determine whether the leaf changes were connected to the patches and stripes of grass that were beginning to yellow.

52.     Furthermore, the condition of the grass was confounded by uncertainty over whether a prior misapplication of fertilizer or pre-emergent might have been causing lingering effects.

53.     HES had consistently communicated that any sterilant applications would be limited to sidewalks, parking lots, and other hardscape areas, not near trees or landscaped portions of campus. Exhibit 4.

54.     At the time of these initial observations, neither Mr. Lester nor SNU had any reason to suspect chemical injury. They are not experts in agronomy, horticulture, or herbicide effects, and the symptoms observed, especially on the trees, did not clearly point to a chemical cause.

55.     Moreover, upon initial observation, Mr. Lester believed the discoloration could be related to the drought Oklahoma was experiencing (see Figure 1) or related to the pre-emergent/over fertilization issues in the spring. Exhibit 6.



Figure 1.

56.     Mr. Lester's belief that drought conditions could be responsible for the discoloration was not speculative or based on his own assumption. Earlier in June 2023, HES's Vice President of Grounds Management, Mr. Pipp, expressly represented to SNU in writing that, "I would also expect that with the heat and no rain campus will look very brown and 'dead' towards the end of next week." Exhibit 7. This affirmative statement by HES reasonably led Mr. Lester and other SNU officials to view the emerging turf and tree discoloration as possibly the result of drought or other natural stressors, leaving them uncertain but without any reason to suspect chemical injury. It further demonstrates why, upon first observing a handful of trees and patches of grass beginning to yellow, SNU neither knew nor reasonably should have known that herbicide damage was the cause.

57.     Moreover, and as explained more fully below, the full nature and extent of the injury could not have been reasonably discovered until later, when the damage

progressed sufficiently to reveal its likely true cause and to distinguish it from other confounding environmental factors.

58.    Published studies, informational guides and product literature confirm that HYVAR is a residual soil sterilant that requires time to manifest significant visible injury in trees because it must first be absorbed through the root system. Exhibit 8. This means that, *particularly for trees and other woody plants*, symptoms of chemical injury may not appear immediately upon application but develop gradually over time, and the speed of such progression is dependent on a myriad of variables. *Id*

59.    Professors at Purdue University note that the detection of herbicidal injury can be difficult to source and write, "Herbicide injuries usually appear within days after exposure, but symptoms may develop several weeks after exposure. Injuries may occur considerably later if tree roots grow into sites that were treated with a soil sterilant within the last two years." Purdue Univ. Coop. Extension Serv., *Diagnosing Herbicide Injury on Garden and Landscape Plants* (ID-184-W 2021), available at, https://www.extension.purdue.edu/extmedia/id/id_184_w.pdf.

60.    Likewise, Dr. A. Brady Self, professor of forestry at Mississippi State University - Extension concurs, "Most herbicides do not work instantaneously; damage symptoms occur from days to weeks after exposure. Foliar exposure typically results in faster observable damage than damage from root absorption of soil-active herbicides." A. Brady Self, *Common Landscape Herbicides and Their Effects on Trees*, Miss. State Univ. Extension, (Pub. No. 3273, Oct. 2021), available at,

https://extension.msstate.edu/publications/common-landscape-herbicides-and-their-effects-trees.

61.     Thus, Mr. Lester's initial observation of only a few discolored trees in early July 2023 was entirely consistent with the known mode of action of HYVAR, which requires time to move through the soil and root system before producing visible symptoms. The fact that the full scope of injury did not become apparent until spring 2024, when unaffected vegetation recovered but HYVAR-exposed trees continued to decline, further reflects this mode of action. Only at that point could the true nature and extent of the damage be reasonably understood.

62.     Following his initial observations, in approximately early July 2023, Mr. Lester raised the issue with Mr. Jackson, HES's Director of Grounds at SNU.

63.     Mr. Lester asked Mr. Jackson whether he had noticed the discoloration on the trees and grass, and whether he knew what might be causing the change.

64.     Mr. Jackson replied that he did not know what could be causing the discoloration.

65.     At no point during that conversation did Mr. Jackson suggest to Mr. Lester that the discoloration might be chemically induced, further reinforcing the impression that no herbicide or chemical application was implicated.

66.     SNU reasonably relied on Mr. Jackson's representation, made in his capacity as HES's on-site director of grounds, that the cause of the discoloration was presently unknown.

67.     Upon information and belief, Mr. Jackson's representation was, at minimum, negligent, in that he failed to exercise reasonable care in accurately communicating information about HES's chemical use. In the alternative, the statement was knowingly false or recklessly made with intent to mislead, and thus constitutes actual or constructive fraud.

68.     By representing ignorance, either intentionally or negligently, HES affirmatively lulled SNU into believing there was no chemical connection to investigate, thereby concealing material facts uniquely within HES's knowledge and control.

69.     Had Mr. Jackson exercised reasonable care or truthfully disclosed what HES had applied, SNU could have further investigated, mitigated, and remediated far earlier.

70.     On July 19, 2023, SNU provided written notice terminating only the grounds services portion of its contract with HES, effective August 31, 2023. Exhibit 9.

71.     HES, however, continued to perform custodial services under the same agreement, and SNU did not terminate that portion of the contract until approximately one year later. *Id*.

72.     Conspicuously absent from SNU's July 19, 2023, notice of termination is any reference to tree damage anywhere on SNU's campus. *Id.*

73.     The only property damage noted in the termination letter concerned turf grass from the spring of 2023. *Id*.

74.     The reason is clear: as of July 19, 2023, SNU neither knew nor had any reasonable basis to know that HES had improperly applied HYVAR XL (including any

other similar chemical) in a manner that would soon cause widespread and catastrophic injury to SNU's trees and landscaping.

75.    As the photograph below reflects, even on July 20, 2023, the five to six trees near the Hills dorm presented a mixed condition, some leaves had turned yellow or brown, while others remained a healthy green:



Figure 2.

76.    The mixed presentation of yellowing leaves alongside healthy green ones, as observed on July 20, 2023, created uncertainty in the minds of SNU officials, including Mr. Lester, delaying their ability to reasonably determine that herbicide exposure, rather than drought or other environmental factors, was the cause of the discoloration.

77.    On or about July 20, 2023, SNU's Ron Lester met with Darren Jolliff ("Mr. Jolliff"), of Jolliff Tree Care, Inc., for SNU's annual tree survey, a routine inspection the university conducts to evaluate the health of campus trees and identify those that may require maintenance, treatment, or removal.

78.    Mr. Jolliff is expected to testify to the following facts below.

79.    During the summer 2023 survey, Mr. Lester walked the campus with Mr. Jolliff.

80.    When the two neared the Hills dorms, Mr. Lester pointed out several of the campus trees exhibiting the leaf discoloration near the Hills dorm.

81.    Mr. Lester asked Mr. Jolliff if he knew what could be causing the discoloration.

82.    Mr. Jolliff responded that he was perplexed by the appearance of the trees, and he and Mr. Lester discussed a range of potential causes, from naturally occurring stressors to the possibility of chemical injury.

83.    During the conversation, Mr. Lester asked whether the symptoms could have been caused by improper use of a pre-emergent or improper application of fertilizer.

84.    Mr. Jolliff stated that he did not believe the observed discoloration was consistent with the effects of either an improperly applied pre-emergent or fertilizer.

85.    As the two spoke, Mr. Lester asked whether the use of a "sterilant" could have caused the discoloration.

86.    Mr. Jolliff responded that it was possible a soil sterilant could have caused damage but emphasized that without knowing the precise type of sterilant applied, he could not render an opinion.

87.    After the survey, SNU, through Mr. Lester, acted promptly to investigate further.

88.    Mr. Lester returned to the Facilities Management office, located near Northwest 42nd Street and North Asbury Avenue. In an area under HES's exclusive control, Mr. Lester began searching for boxes or bottles of chemicals that might reveal the identity of the "sterilant" HES had represented that it intended to use.

89.    On or about July 20, 2023, Mr. Lester discovered a box of HYVAR XL containing what appeared to be four empty bottles. Exhibit 10.

90.    Mr. Lester is not trained in the application of commercial herbicides and did not immediately know what HYVAR-XL was but contacted Mr. Jolliff and asked if HYVAR-XL could explain the discoloration observed.

91.    Mr. Jolliff advised Mr. Lester that HYVAR XL, a soil sterilant, could potentially damage trees but did not confirm that it was causing the observed discoloration.

92.    Notwithstanding Mr. Jolliff's statement of what HYVAR XL is capable of, neither he nor Mr. Lester knew at that time whether HYVAR XL had in fact been applied to SNU's campus, or, if so, in what quantity, concentration, or the exact dates or location of application(s).

93.    Therefore, as of July 20, 2023, it remained uncertain whether the observed discoloration did, in fact, reflected a chemical injury, and if so, whether the damage was

permanent, threatening the structural health of the trees, or merely temporary foliar stress expected to resolve with regrowth the following spring.[1]

94.     Herbicide injury symptoms are notoriously ambiguous and inherently inconsistent. As explained by Oklahoma State University ("OSU") horticulture/floriculture experts, professors Michael A. Schnelle and Janet C. Cole, many forms of chemical damage, such as chlorosis (leaf yellowing), spotting, or distorted growth, can be easily mistaken for drought stress, nutrient deficiencies, pathogens, or insect injury. Exhibit 11.

95.     In fact, OSU's professors caution that "many herbicide injuries mimic symptoms exhibited by a pathogen, insect, or abiotic stress," and that proper diagnosis often requires expertise from horticulturists, plant pathologists, and entomologists, and sometimes even laboratory confirmation. *Id*; *See also*, Purdue Univ. Coop. Extension Serv., *Diagnosing Herbicide Injury on Garden and Landscape Plants* (ID-184-W 2021), available at, https://www.extension.purdue.edu/extmedia/id/id_184_w.pdf (noting herbicide injury is difficult to detect and test, and has many "look alikes"); A. Brady Self, *Common Landscape Herbicides and Their Effects on Trees*, Miss. State Univ. Extension, (Pub. No. 3273, Oct. 2021), available at, https://extension.msstate.edu/publications/common-landscape-herbicides-and-their-

---

[1] *See*, *e.g.*, University of California Integrated Pest Mgmt. Program, *Herbicide Damage* (2023), available at, https://herbicide-symptoms.ipm.ucanr.edu/herbicide-damage/#gsc.tab=0 ("It is not uncommon for plants affected by herbicide to recover from symptoms, even with the occurrence of considerable dieback. This is particularly true with trees and other woody plants that have the ability to store carbohydrates and also have protected meristems in dormant buds. Trees have a remarkable ability to survive and recover from herbicide injury").

effects-trees (stating, "Diagnosing herbicide injury symptoms can be very difficult... Accurate diagnosis of herbicide damage often requires an expert in identifying herbicide injury and herbicide activity in plants. Chemical analysis is possible but only feasible while detectable levels of the herbicide are still present in plant tissues or in nearby soil. These tests are expensive and only applicable to specific herbicides").

96.    The OSU guidance further emphasizes that knowing the precise chemical involved is critical, because the appropriate remedial measures depend entirely upon the identity, formulation, and concentration of the herbicide. *Id*.

97.    Moreover, OSU guidance cautions that without knowing the chemical misapplied or drifted, it is nearly impossible to arrive at a solution to alleviate further damage. *Id*.

98.    The mere fact that HES referred to the product it was applying as a "sterilant" did not place SNU on notice that a federally restricted, total-kill soil sterilant such as HYVAR XL was being used.

99.    As professors Schnelle and Cole note, many herbicides are selective, designed to kill only certain vegetation, while others can become nonselective if deliberately or accidentally applied at high rates. Exhibit 11. Even well-known nonselective products, such as glyphosate, do not persist in the soil and are not considered true sterilants. *Id*.

100.    By withholding the actual product name and hiding behind a generic term, HES's including Mr. Jackson and Mr. Pipp, either intentionally or unintentionally, misled

SNU and deprived it of the very information necessary to recognize and respond to the unfolding damage.

101.    By withholding the actual product name and hiding behind a generic term, HES, including Mr. Jackson and Mr. Pipp, misled SNU and deprived it of the very information necessary to recognize and respond to the unfolding damage.

102.    In the weeks and months that followed Mr. Lester's discovery of HYVAR XL, (August, September, October, November and December 2023), the discoloration slowly progressed on SNU's campus, with a few more trees beginning to show inconsistent signs of yellowing.

103.    But given the highly technical nature of herbicide-related environmental damage, coupled with the absence of access to HES's internal chemical application records and drought conditions, SNU faced exceptional difficulty and expense in independently determining whether HYVAR had been used and whether it was the source of the observed deterioration.

104.    Even after SNU discovered empty HYVAR XL containers on July 20, 2023, its ability to identify the cause of injury was materially frustrated by HES's refusal to disclose its application records or the scope of its chemical use. Authoritative extension publications, including Mississippi State University's *Common Landscape Herbicides and Their Effects on Trees*,[2] warn that symptoms from soil sterilants may take weeks or months

---

[2] *See also*, University of California Integrated Pest Mgmt. Program, *Herbicide Damage* (2023), available at, https://herbicide-symptoms.ipm.ucanr.edu/herbicide-damage/#gsc.tab=0 ("Herbicide symptoms vary depending on the herbicide, the rate of application, stage of growth, type of exposure, and the plant species receptor involved.").

to appear. Without access to HES's records, information uniquely within HES's control, SNU could not determine whether HYVAR had been applied, in what concentration, or at which locations. This concealment prevented SNU from distinguishing herbicide injury from natural stressors such as drought, delaying discovery and compounding the environmental damage.

105.    By the mid to late fall of 2023, SNU noticed that several trees appeared dead.

106.    Those trees, approximately, four of them, were removed over safety concerns.

107.    Nevertheless, compounding the uncertainty, the natural dormancy of vegetation during the fall and winter months further obscured the distinction between normal seasonal dieback and chemical-related injury. The subtle onset and overlapping timing masked telltale signs of environmental disruption such that the full scale and scope of the damage would not be revealed until the spring of 2024

108.    It was not until spring 2024, when unaffected vegetation revived while large portions of SNU's campus' tress, shrubs, and grass remained barren, that the pattern of damage became unmistakable. Only then could SNU reasonably conclude that the injury was not attributable to drought or other natural stressors, but instead was likely consistent with HES's application of HYVAR or a similar soil sterilant in violation of federal labeling and industry standards.

109.    In response to the considerable observed damage, SNU re-initiated communications with HES officials to engage in mitigation efforts.

110.    However, emails and other correspondence show that HES repeatedly deflected inquiries, provided vague or noncommittal responses, and withheld critical information, including application logs and chemical application details, that would have likely enabled SNU to identify the cause and extent of the damage.

111.    Near the end of May 2024, SNU surveyed its campus in detail, documenting the damage it suspected HES had caused.

112.    Following the survey, SNU officials provided the information to Terrall Woodall ("TJ or T Jay") via email.

113.    In response to this, T Jay told SNU that HES would review the information and reach out to schedule a meeting.

114.    What in fact occurred what nearly the opposite. HES officials began a stonewalling camping, designed to delay and obscure the truth, and mislead SNU.

115.    For example, after providing the survey information to HES, SNU officials worked in June 2024 to schedule an on-site meeting with T Jay and Jesus Mendez ("Mr. Mendez"), Senior Vice President of Operations for HES to discuss the damage.

116.    An on-site meeting was set for July 1, 2024.

117.    T Jay appeared at the meeting, but Mr. Mendez failed to show up in person, later claiming that he believed the meeting was virtual despite clear and the written communication to the opposite from SNU.

118.    SNU officials then created a link and asked Mr. Mendez to appear by video.

119.     The meeting with HES's T Jay and Mr. Mendez was short.

120.    Attending the meeting for SNU was Mr. Lester and Dennis Martin, Director of University Operations.

121.    As soon as Mr. Lester and Mr. Martin started discussing the damage and their belief that HES may have damaged the university's property, Mr. Mendez shut down the meeting, telling SNU that HES would need to get their insurance carrier involved.

122.    On or about July 12, 2024, Mr. Martin conferred virtually with Mr. Mendez. During that call, Mr. Mendez offered to pay SNU between $5,000 to $10,000 per tree to offset the damage but could not commit to more unless SNU would agree to extend the custodial contract. Mr. Martin declined to engage further, believing the tree damage needed to be addressed outside of custodial contract negotiations.

123.    In the days and weeks and months that followed, SNU continued to make efforts to communicate with HES officials about the damage, but HES stonewalled, never providing specific information on the chemical used or application logs, but representing to SNU that HES would investigate the matter.

124.    In approximately August 2024, HES affirmatively represented in to SNU that it would send an expert to the university's campus to survey the alleged damage.

125.    Consistent with that representation, during the second week of August 2024, HES dispatched Mark A. Webber, a purported "registered consulting arborist," to SNU's campus to conduct an inspection. Exhibit 12.

126.    Mr. Webber arrived on campus on or about August 12, 2024, and conducted an inspection.

127. During his inspection or thereafter, Mr. Martin requested that SNU provide chemical information related to de-icing on campus that the university's current groundskeeping service provider may have applied. Exhibit 12.

128. SNU complied in good faith providing MSDS-style[3] information and, through Mr. Martin, specifically and repeatedly requested that HES make its own herbicide application logs available to the university. *Id*.

129. In response, Mr. Webber directed Mr. Martin to contact HES directly. Despite Mr. Martin's follow-up, HES never provided the requested records, further exemplifying its pattern of stonewalling and concealment. *Id*.

130. At all relevant times, Mr. Webber acted under HES's direction, control, and authority, not as an independent evaluator. HES itself selected, retained, and dispatched Webber to SNU's campus in response to SNU's inquiries, expressly representing him as an "outside expert" who would prepare a report on the damage. In that role, he functioned as HES's agent and mouthpiece.

131. Indeed, when Webber first received requests from SNU, he ignored them until SNU's Dennis Martin followed up a second time to solicit a response, further demonstrating that Webber was neither independent nor autonomous, but acting only at HES's instruction and for its benefit. *Id*.

---

[3] An MSDS (Material Safety Data Sheet), now more commonly referred to as a SDS (Safety Data Sheet), is a standardized document mandated by OSHA regulations (*see generally*, 29 C.F.R. § 1910.1200) that discloses the hazards, labeling restrictions, and safe handling requirements of chemical products such as herbicides and de-icing agents.

132.    Upon information and belief, Mr. Webber's conduct, including requesting SNU's own records and then deflecting inquiries about herbicide application logs back to HES, was carried out with HES's knowledge, authorization, and control. Accordingly, Webber's actions and omissions are attributable to HES under principles of actual and apparent authority.

133.    Around the time of the inspection, the summer of 2024, SNU was engaged in on-going negotiations with HES about extending the company's custodial services agreement.

134.    On or about August 16, 2024, Mr. Mendez wrote the following to Mr. Martin at SNU:



Figure 3.

135.    This communication raises four significant issues. First, HES conditioned a purported "donation" to the University on the award of custodial service contracts, thereby intertwining financial incentives with ongoing contract negotiations. To the extent HES later characterizes this as a "settlement" or "payment," the communication was, at best, ambiguous, and cannot reasonably be construed as a good-faith settlement offer.

136.    Second, HES represented that it had retained a professional company to assess the tree damage and affirmatively promised to share the resulting report with SNU. By doing so, HES implicitly acknowledged that the damage on campus was serious enough to require expert evaluation and investigation.

137.    Third, and perhaps most critically, no such report was ever produced, underscoring HES's pattern of concealment and bad faith.

138.    Fourth, the very fact that HES retained an outside expert confirms that even to HES as of the summer of 2024, the source and scope of the damage were not obvious and required specialized evaluation. Indeed, on July 20, 2023, SNU consulted its long-time arborist, Mr. Jolliff, during its annual tree survey, and Mr. Jolliff expressly stated that without knowing whether HYVAR had, in fact, been applied, knowing the chemical mixture rate or locations of application, he could not confirm that the observed tree discoloration was caused by herbicide injury. His caution underscores that the information necessary to reach a definitive conclusion, application records and chemical identity, remained exclusively within HES's control. Thus, HES's own decision to commission an expert, coupled with its refusal to disclose either its records or the promised report, underscores that it was not reasonably possible for SNU to confirm herbicide injury during

26

the summer of 2023 and that subsequent mitigation efforts were materially hampered by HES's concealment.

139.    HES's failure to produce the promised assessment not only prejudiced SNU's ability to evaluate the extent of the injury in real time, but also further demonstrates HES's pattern of concealment and bad faith in withholding material information uniquely within its possession.

140.    By withholding information it had uniquely within its control, HES misled SNU into believing that a professional evaluation would be forthcoming. This omission, whether negligent, intentional fraudulent, or constructively fraudulent, deprived SNU of timely access to critical facts regarding the cause and scope of the damage.

141.    SNU reasonably relied on HES's representation that a professional assessment would be forthcoming. In reliance on that assurance, SNU reasonably delayed commissioning its own investigation, believing a professional report would clarify the situation. This reliance was foreseeable, and it directly exacerbated the injury by delaying remedial measures and allowing HYVAR's effects to progress unchecked.

142.    By applying HYVAR XL (or another similar chemical) to a college campus where students, faculty, visitors, and children regularly congregate and recreate, HES exposed both people and property to unnecessary and foreseeable harm. This conduct constitutes, at minimum, negligence, and, in the alternative, gross negligence or recklessness, reflecting a conscious and willful disregard for the health, safety, and property of SNU's community.

143.    In the alternative, and without limitation to any other averment, HES compounded its misconduct by applying a hazardous soil sterilant to property it did not own and then refusing to disclose to SNU officials the identity of the chemical when directly asked. This conduct was, at minimum, grossly negligent or reckless, and, in the alternative, actually fraudulent or constructively fraudulent. By concealing material facts uniquely within its control, HES not only breached its duty of care but also acted with a conscious and deceitful disregard for SNU's right to know what had been placed on its own campus, thereby endangering the health and safety of persons and the integrity of SNU's property.

144.    At all relevant times, HES maintained exclusive control of all herbicide applications (including MSDS-style information) and was contractually and professionally obligated to keep detailed records of chemical usage.

145.    Rather than cooperating, HES stonewalled SNU's inquiries, offered misleading and incomplete information, and refused to produce documents that were exclusively in its possession and essential to diagnosing the cause of the damage.

146.    Due to the technical complexity of identifying herbicide-related damage and the latency between application and observable symptoms, SNU reasonably relied on HES's superior knowledge and professional responsibility to disclose its use of chemicals.

147.    Upon information and belief, HES actively concealed the improper use of HYVAR (or another chemical) and withheld information critical to SNU's ability to timely determine the probable source and scope of the environmental harm, and to engage in emergency mitigation efforts during the summer of 2023.

148.   Upon information and belief, HES knew that it had applied HYVAR (or another chemical) in a manner expressly prohibited by law and labeling, including in locations and around tree species where its use is strictly barred, and deliberately withheld that fact to avoid liability.

149.   At no point did HES take responsibility for its actions or make a good faith effort to assist SNU in understanding or remedying the damage it had caused. Instead, HES took advantage of SNU's trust and lack of access to the relevant application data by stonewalling efforts to obtain transparency.

150.   HES had an affirmative duty to provide SNU with information concerning the chemicals it used on its campus not only under its contract, but under federal and state law, and its refusal to do so left SNU blindfolded in its efforts to protect its students, diagnose the cause, and mitigate further damage.

151.   HES's conduct constitutes a pattern of professional misconduct, including misrepresentation by omission, failure to adhere to professional norms governing pesticide use, and knowing concealment of material information. Its actions were not merely the product of a single negligent act but reflect a systemic breach of trust and sustained concealment aimed at avoiding accountability for unlawful practices.

152.   Upon information and belief, while SNU suffered mounting and irreversible environmental losses, HES chose to protect itself rather than fulfill its duty of good faith performance under the contract.

153.   HES's deceit and bad-faith conduct materially impaired SNU's ability to identify, mitigate, and respond to the damage, resulting in months of compounded harm.

154.    By October 2024, HES ceased all direct communication with SNU and instead engaged legal counsel ("lawyered up") and cut off any collaborative dialogue it had previously represented would occur.

155.    Upon information and belief, the HES personnel responsible for applying HYVAR (or another chemical) on SNU's campus were neither properly trained nor licensed in accordance with applicable state and federal requirements governing restricted-use pesticides.

156.    Upon information and belief, HES's failure to ensure that only qualified applicators handled federally regulated herbicides such as HYVAR constitutes a gross deviation from industry norms and regulatory obligations and directly contributed to the widespread environmental harm suffered by SNU.

157.    Upon information and belief, HES used sprayers, including the Z-Max sprayer and spreader ("Z-Max"), that were not properly calibrated for the mix rate, pressure settings, and droplet size required by HYVAR XL's label, and failed to follow wind-drift precautions, resulting in overspray that caused visible damage to trees and turf observed by SNU personnel by early July 2023.

158.    Even assuming, *arguendo*, that HYVAR could have been lawfully applied on SNU's campus, the Z-Max (or similar equipment) was the wrong equipment because it is designed for large-scale broadcast applications across expansive areas, and not for the precise, limited spot treatments required to safely apply a restricted-use sterilant like HYVAR in a landscaped college campus setting.

159.    HES's conduct constitutes not only a breach of contract, but a knowing and dishonest failure to perform in good faith, in reckless disregard of its obligations and of the foreseeable harm to SNU's property. The result is that there are over $1,000,000 in continuing losses, degradation of SNU's campus environment, reputational damage, and the unnecessary destruction of mature trees and irreplaceable landscaping, all of which are directly traceable to HES's unlawful acts and deliberate concealment.

160.    HES's misconduct has resulted in the widespread and irreversible destruction of campus vegetation, including the death or severe decline of more than fifty mature trees, many of which were decades-old hardwoods such as oaks, maples, pines, elms, and redbuds, along with extensive damage to turf, ornamental shrubs, and the surrounding soil ecosystem. Exhibit 10. These were not merely ornamental plantings, but integral elements of SNU's historic and environmental landscape, representing decades of growth, care, and institutional heritage.

161.    Among the trees severely damaged was a cherished Redbud planted in solemn remembrance of the 168 lives lost in the 1995 bombing of the Alfred P. Murrah Federal Building. Accordingly, SNU's losses are not merely cosmetic; they represent the near irreversible destruction of natural and symbolic assets that cannot be replicated within a generation.

162.    As the damage progressed during the summer 0f 2024, many of the affected trees began to rot, losing structural integrity and posing an imminent safety hazard to students, faculty, and visitors on campus. To mitigate the risk of falling limbs or complete

tree collapse, SNU was forced to undertake emergency removal of numerous trees at substantial cost.

163.    The university hosts thousands of students annually through its undergraduate, graduate, and professional studies programs and maintains a well-known, carefully cultivated campus environment that reflects its commitment to excellence and tradition.

164.    Maintaining a well-kept and aesthetically beautiful campus is of paramount importance to SNU, as it is to virtually all brick-and-mortar universities whose reputations and recruitment efforts are closely tied to the appearance of their grounds.

165.    In the aftermath of the damage caused by HES's misconduct, SNU was forced to undertake extraordinary and costly measures to preserve its public image and avoid embarrassment during high-profile campus events such as commencement ceremonies, new student orientation, and recruitment events on campus.

166.    SNU's identity and ability to attract students, faculty, and philanthropic support is intimately tied to its campus environment. As a result of HES's misconduct, SNU incurred not only direct physical and financial losses, but suffered harm to its goodwill, donor trust, and public image during key recruiting periods.

167.    In addition to Mr. Jolliff, SNU has retained an additional expert who has determined, to a reasonable degree of scientific and professional certainty, that HYVAR was not only the direct cause of the environmental damage on SNU's campus, but also that HES applied HYVAR in a manner inconsistent with its labeling and regulatory restrictions.

168.    In addition to Mr. Jolliff, SNU's second retained expert has determined, and will testify to a reasonable degree of scientific and professional certainty, that no other plausible cause accounts for the scope, pattern, progression, and persistence of the environmental damage observed on SNU's campus other than the misapplication of HYVAR (or other similar sterilant).

169.    As set forth in the product's official registration and labeling, attached hereto as Exhibit 8, HYVAR is expressly prohibited from use in residential, recreational, or landscaped settings, including areas with desirable vegetation, tree cover, or turf, as explained:

> "Injury or loss of desirable trees or other plants may result if HYVAR X-L IVM Herbicide is applied or equipment is drained or flushed on or near desirable trees or other plants, on aeras were their roots may extend, or in locations where the chemical may be washed or moved into contact with their roots . . . . **Do not use HYVAR X-L IVM Herbicide in residential areas or around homes in areas such as lawns, driveways or parking lots. Do not use HYVA R X-L IVM Herbicide in recreational areas such as bike, jogging or golf cart paths, tennis courts, in or around homes, or in areas where landscape plantings could be anticipated.**"

170.    The label further cautions against use near the root zones of hardwood species such as oaks, elms, and maples, and warns that improper application may result in permanent soil sterilization and the death of non-target plant life. *Id*.

171.    These restrictions are not advisory, they are mandatory regulatory conditions imposed by the Environmental Protection Agency under the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA) (7 U.S.C. §136-136y), and have the force of federal law.

172.    Specially, 7 U.S.C. § 136j(a)(2)(G) holds that it shall be unlawful for any person "to use any registered pesticide in a manner inconsistent with its labeling.

173.    7 U.S.C. § 136(ee) defines to use any registered pesticide in a manner inconsistent with its labeling.

174.    Defendant's use of HYVAR in a manner inconsistent with its EPA-approved labeling violated Oklahoma law, which independently requires pesticide use in accordance with label directions and applicable licensing rules. These state-law duties parallel, and are not additional to or different from, FIFRA requirements; their breach constitutes negligence *per se*.

175.    In addition, EPA regulations governing pesticide applicator safety and training, including the Worker Protection Standard (40 C.F.R. Pt. 170) where applicable, require adherence to label restrictions, training, and protective measures for handlers of Restricted Use Pesticides. These frameworks underscore the baseline duties HES was required to meet when applying HYVAR.

176.    Oklahoma law mirrors these federal safeguards through statutes and administrative regulations administered by the Oklahoma Department of Agriculture. Specifically, under 2 O.S. § 3-82(A)(1)(d), any individual who applies a Restricted Use Pesticide must be properly licensed by the state. This statutory requirement ensures that only qualified personnel engage in the use of dangerous herbicides and establishes a baseline duty of care enforceable under Oklahoma law.

177.    Additionally, the Oklahoma Administrative Code, particularly OAC 35:30-17-30, *et seq*., sets forth detailed regulations governing the application, storage, and

supervision of herbicides within the state. These regulations require that applications be conducted in compliance with all label directions and in a manner that prevents off-target injury to desirable vegetation. Violations of these rules not only constitute administrative offenses but also serve as evidence of negligence *per se* and gross disregard for public safety and environmental protection.

178.   HES's unauthorized and improper application of HYVAR (or another chemical), coupled with its deliberate failure to disclose that application to SNU, constitutes a reckless, willful, and unlawful disregard for both federal and Oklahoma environmental regulations, as well as the express legal obligations imposed by the product's EPA-approved labeling.

179.   HES's conduct further breached industry standards of care and professional duties to ensure transparency and safety in all chemical applications performed on SNU's campus. For example, guidance from the Purdue specifically notes that the product like HYVAR is designed for use along highways, railroads, fences, power lines, and similar places, stating, "Never use soil sterilant in a landscape setting." Purdue Univ. Coop. Extension Serv., *Diagnosing Herbicide Injury on Garden and Landscape Plants* (ID-184-W 2021), available at, https://www.extension.purdue.edu/extmedia/id/id_184_w.pdf.

180.   By virtue of its exclusive control over the application of hazardous chemicals and its superior access to herbicide records, HES stood in a position of trust and confidence relative to SNU.

181.   Upon information and belief, HYVAR's active ingredient, lithium salt of bromacil, can remain active in the soil for years, with residues detectable at 18 months after

a single application.[4] This means SNU may not be able to simply replace the destroyed trees and vegetation and expect recovery; instead, effective remediation may require complete excavation and removal of the contaminated soil layer, followed by importation of clean soil to replace it.

182.    The absence of a "positive hit" for bromacil in any single soil test does not conclusively rule out its continued presence or effect. Because of the inherent difficulties in consistent soil testing and because bromacil is a persistent herbicide that binds to soil particles, it may exist in concentrations below common detection thresholds while still exerting phytotoxic effects on sensitive tree species.[5]

---

[4] *See*, *e.g.*, U.S. Envtl. Prot. Agency, *Reregistration Eligibility Decision (RED) Facts: Bromacil* 3 (Aug. 1996), https://www3.epa.gov/pesticides/chem_search/reg_actions/reregistration/fs_PC-012301_1-Aug-96.pdf?; U.S. Envtl. Prot. Agency, *Bromacil: Human Health Risk Assessment for Proposed Uses on Citrus, Pineapple, and Turf and for Use on Non-Food Sites* 15 (2012), EPA-HQ-OPP-2012-0445-0019, available at https://downloads.regulations.gov/EPA-HQ-OPP-2012-0445-0019/content.pdf; Extension Toxicology Network, *Bromacil: Pesticide Information Profile*, at Environmental Fate available at, https://extoxnet.orst.edu/pips/bromacil.htm

[5] U.S. Envtl. Prot. Agency, *Reregistration Eligibility Decision (RED) for Bromacil* 19–21 (2006), available at, https://www3.epa.gov/pesticides/chem_search/reg_actions/reregistration/red_PC-012801_1-Sep-06.pdf; *See generally*, Australian Government Grains Rsch. & Dev. Corp., *Soil and Plant Tissue Testing for Herbicide Residues: How Can It Help?* (Feb. 2022), available at https://grdc.com.au/resources-and-publications/grdc-update-papers/tab-content/grdc-update-papers/2022/02/soil-and-plant-tissue-testing-for-herbicide-residues-how-can-it-help; Australian Government Cooperative Research Centre for High Performance Soils, *Tools to Manage Herbicide Residues in Soil* (April 2025), available at, https://soilcrc.com.au/resources/tools-to-manage-herbicide-residues-in-soil-fact-sheet/.

183.    Detection is further complicated by sampling limitations, heterogeneous soil distribution, and the chemical's gradual degradation profile.[6] Accordingly, even where laboratory reports return "non-detect" results, residual bromacil may remain active in the soil (bioactive effect) and capable of preventing replanting or recovery of desirable vegetation for many months and even years after application.[7]

184.    Because bromacil residues may persist in soil at biologically active levels even after laboratory tests fail to detect them, SNU cannot safely rely on negative test results as assurance that its grounds are free from contamination. This uncertainty forces SNU to assume the risk that replanting could fail or cause renewed vegetation loss (especially for timber), thereby escalating remediation costs. In practical terms, to avoid the risk of vegetation failure caused by HYVAR, the university must likely either remove and replace contaminated soil entirely or engage in prolonged, costly monitoring before attempting replanting, substantially increasing the scope and expense of restoration efforts. Thus, the persistence of bromacil, combined with the risk of false negatives in soil assays, directly exacerbates SNU's damages by rendering traditional replanting efforts unsafe and economically unreasonable without first undertaking extensive soil remediation.

---

[6] Washington State Dep't of Transp., *Bromacil: Hazardous Substance Fact Sheet* (2000), available                                                                                                                                             at, https://wsdot.wa.gov/publications/fulltext/Environmental/Herbicides/Bromacil.pdf
[7]    EXTOXNET, *Pesticide Information Profile: Bromacil* (1996), available at, http://extoxnet.orst.edu/pips/bromacil.htm (reporting that residues may be detectable in soil for up to 18 months after a single application, and noting variability in persistence).

185.    SNU asserts that HES's actions, inflicting lasting environmental damage and compounding it through a deliberate and deceitful coverup, warrant a forceful and punitive legal response commensurate with the gravity of the misconduct

## IV. CLAIMS FOR RELIEF

### COUNT I – BREACH OF CONTRACT

186.    Plaintiff incorporates by reference all previous paragraphs as though they were set out full herein.

187.    A valid and enforceable contract existed between Plaintiff and Defendant for grounds maintenance services, including herbicide application.

188.    Defendant breached that contract as outlined above by applying a prohibited herbicidal agent or agents in violation of labeling guidelines, regulations, and the contract's express and implied terms.

189.    As a direct and proximate result of Defendant's breach, Plaintiff has suffered substantial damages, including but not limited to the death and destruction of trees, grass, shrubs, and associated landscaping, as well as consequential loss related to campus aesthetics and property value, in an amount exceeding an estimated $1,000,000.

**WHEREFORE**, Plaintiff respectfully requests that the Court enter judgment in its favor and against Defendant HES Facilities Management, LLC for actual and consequential damages, attorney's fees, and such other and further relief as the Court deems just and proper.

## COUNT II – NEGLIGENCE

190.    Plaintiff incorporates by reference all previous paragraphs as though they were set out fully herein.

191.    Defendant owed Plaintiff a duty arising from the contract, applicable federal pesticide regulations, industry standards for herbicide application, and common law principles of ordinary care.

192.    Defendant owed Plaintiff a duty to perform all services, including herbicide application, with reasonable care, in accordance with industry standards, product labeling, and applicable laws and regulations.

193.    These duties existed independently of the contract, arising from federal law, state licensing regulations, and the common-law duty to exercise reasonable care when handling hazardous substances.

194.    Defendant breached its duty, including, but not limited to, by:

    i.    Selecting and applying HYVAR XL (or another restricted-use soil sterilant) in locations and under conditions expressly prohibited by its EPA-approved labeling, in violation of the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA) and Oklahoma pesticide regulations;

    ii.    Permitting unlicensed and/or unqualified personnel to handle and apply a federally restricted-use pesticide, contrary to both federal law and Oklahoma licensing requirements;

iii.    Failing to properly train, supervise, and monitor its employees or applicators in the safe use of restricted-use herbicides;

iv.    Concealing and failing to disclose its use of HYVAR (or another restricted-use chemical) despite having exclusive knowledge and control of herbicide operations on campus, thereby depriving SNU of the ability to take timely remedial steps;

v.    Refusing to produce timely or accurate herbicide records or information, in violation of statutory and regulatory requirements, thereby obstructing mitigation and compounding the scope of injury;

vi.    Representing to SNU officials in the summer of 2023, when questioned about visible vegetation damage, that HES was "unaware" of the cause, despite superior knowledge of its own chemical applications, thereby misleading SNU and delaying discovery; and

vii.    Otherwise failing to exercise the level of care that a reasonably prudent facilities management company, trained and certified in pesticide application, would have exercised under similar circumstances.

195.    Defendant's conduct constituted negligence and gross deviation from accepted landscaping and herbicide application practices.

196.    HES's unauthorized use of HYVAR (or another chemical), a Restricted Use Pesticide, by unlicensed and untrained personnel in a manner contrary to the EPA-approved label and FIFRA constitutes negligence *per se*. The statutes and regulations violated were

enacted for the purpose of preventing precisely the type of environmental and economic harm sustained by SNU.

197.   Defendant's liability arises not only from its contractual undertakings, but also from independent duties imposed by Oklahoma common law and by federal and state pesticide regulations.

198.   Plaintiff's claims sound in tort because Defendant's misconduct caused physical injury to tangible property, including the death of more than fifty mature hardwood trees, sterilization of soil, and destruction of living landscapes, rather than mere economic expectancy damages or damages to a product. Put another way, these are physical injuries to real property, not disappointed commercial expectations.

199.   As a direct and proximate result, Plaintiff sustained substantial and ongoing physical, environmental, and economic damages, including the death of irreplaceable mature trees, widespread soil sterilization, loss of campus aesthetics, and significant financial expenditures related to emergency tree removal and remediation efforts.

**WHEREFORE**, Plaintiff respectfully requests that the Court enter judgment in its favor and against Defendant HES Facilities Management, LLC for actual damages, attorney's fees, and such other and further relief as the Court deems just and proper.

## COUNT III – RECKLESSNESS & GROSS NEGLIGENCE

200.   Plaintiff incorporates by reference all previous paragraphs as though they were set out fully herein.

201.   Defendant HES owed Plaintiff Southern Nazarene University duties arising under federal and state law, as well as common-law principles of care, to refrain from

applying hazardous restricted-use herbicides in locations where their use was expressly prohibited, and to disclose all material facts concerning its chemical applications.

202.   Rather than a mere failure of reasonable care, HES's conduct amounted to reckless indifference to known and obvious risks. Specifically, HES:

     i.    Knowingly selected and applied HYVAR XL, a federally restricted-use soil sterilant, in landscaped and recreational areas where its use was explicitly barred by federal labeling law and state regulation;

     ii.    Permitted or directed unlicensed, untrained, or unsupervised personnel to apply HYVAR XL, in conscious disregard of mandatory EPA and Oklahoma licensing requirements;

     iii.    Concealed from SNU the identity of the chemical when directly asked, while knowing that disclosure was essential for diagnosis, remediation, and public safety; and,

     iv.    Misrepresented to SNU officials that it was "unaware" of the cause of visible vegetation damage, despite HES's superior knowledge and exclusive control of its own chemical operations.

203.   Furthermore, HES's application of the federally restricted-use soil sterilant HYVAR on SNU's Bethany campus in June 2023 was reckless and breached its duty of care, as the campus contains dormitory housing, an on-campus disc golf course, tennis courts, and extensive landscaping, rendering it a residential and recreational area where HYVAR XL is expressly prohibited. As set forth in HYVAR's EPA-approved labeling, attached as Exhibit 8, the herbicide must not be used "in residential areas or around homes"

such as lawns or in "recreational areas such as bike, jogging or golf cart paths, tennis courts, in or around homes, or in areas where landscape plantings could be anticipated," due to the risk of injury to desirable vegetation and human safety. Despite knowing or having reason to know of SNU's residential dormitories, recreational facilities, and extensively landscaped grounds, HES applied HYVAR XL, disregarding the label's restrictions and the heightened risk to students, staff, and desirable vegetation in a densely populated academic and residential setting.

204.    This conduct was not an inadvertent lapse or ordinary negligence. It reflects a conscious choice, a willful disregard of mandatory regulatory safeguards and a conscious choice to prioritize concealment over safety and disclosure of the chemical used.

205.    HES's reckless application of HYVAR XL on an active college campus foreseeably endangered not only trees and landscaping, but also the health and safety of students, faculty, and visitors regularly present in the treated areas.

206.    HES's conduct therefore constitutes gross negligence and reckless indifference under Oklahoma law, warranting punitive damages.

207.    As a direct and proximate result, Plaintiff suffered substantial property, environmental, and financial losses in excess of $1,000,000, as well as irreparable harm to its historic campus environment.

**WHEREFORE**, Plaintiff requests judgment for actual and punitive damages, attorney's fees, and any other relief deemed appropriate.

## COUNT IV – NEGLIGENT
## MISREPRESENTATION AND CONSTRUCTIVE FRAUD

208.    Plaintiff incorporates by reference all previous paragraphs as though they were set out fully herein.

209.    In June and July 2023, when SNU officials first observed unusual vegetation stress on campus, SNU directly asked Defendant HES, through its on-site Director of Grounds, Tracy Jackson, to explain the cause.

210.    On or about early July 2023, Mr. Jackson responded to SNU's Executive Director of Facilities Management, Ron Lester, that he "did not know" the cause of the discoloration. This statement was made on SNU's campus in Bethany, Oklahoma, during an in-person conversation between Mr. Lester and Mr. Jackson.

211.    At the time, HES,  through Mr. Jackson and its corporate representatives including Vice President of Grounds Management William "Will" Pipp,  had superior knowledge and exclusive control of all herbicide applications on campus. HES knew it had applied a "sterilant" to campus areas beginning on or about June 19, 2023, and knew or should have known that such chemicals could cause the very type of injury observed.

212.    HES further represented in July–August 2024 communications, including emails from Senior Vice President Jesus Mendez and retained consultant Mark Webber, that HES had engaged outside arborists and would provide SNU with a written professional report concerning tree damage. That report was never delivered.

213.    These statements and omissions, taken together, were materially misleading because they conveyed to SNU that (a) HES was unaware of any chemical cause, and (b)

an independent report would clarify the issue, when in fact HES already possessed critical information but concealed it.

214.    HES owed SNU a duty to exercise reasonable care in communicating information about chemical applications on campus and to refrain from supplying false or incomplete information in the face of direct inquiries about vegetation damage.

215.    HES breached that duty by misrepresenting its ignorance of the cause, by failing to disclose its actual use of HYVAR XL (or another similar chemical), and by omitting material information that was exclusively within its possession and control.

216.    SNU justifiably relied on HES's misrepresentations and omissions by deferring its own investigation, delaying mitigation, and awaiting the promised report.

217.    As a direct and proximate result, SNU suffered significant property and financial damages, including the loss of mature trees, remediation costs, and reputational harm.

218.    As a direct and proximate result of HES's fraudulent conduct during contract performance, SNU suffered significant and ongoing property, economic, and reputational damages in excess of $1,000,000.

**WHEREFORE**, Plaintiff respectfully requests that the Court enter judgment in its favor and against Defendant HES Facilities Management, LLC, for actual and punitive damages, attorney's fees, and such other and further relief as the Court deems just and proper.

## COUNT V – FRAUD / ACTUAL FRAUD

219.    Plaintiff incorporates by reference all previous paragraphs as though they were set out fully herein.

220.    Defendant HES, through specific agents, knowingly made false statements and concealed material facts regarding its herbicide use on SNU's campus.

221.    In early July 2023, Mr. Jackson told SNU's Executive Director of Facilities Management, Ron Lester, during an in-person conversation on SNU's Bethany campus, that he "did not know" what was causing the discoloration of certain trees. This was false and misleading because HES had recently applied a "sterilant" and knew, or should have known, that such chemicals could cause precisely the type of injury being observed.

222.    Moreover, Jackson was not speaking from a position of ignorance. As HES's on-site Director of Grounds, he directly supervised the crews responsible for herbicide application in June 2023, received contemporaneous crew reports, and had access to the very chemical logs that would have revealed the sterilant in use. In addition, only weeks earlier he had overseen turf applications that visibly injured SNU's grass, giving him actual notice that HES's chemical practices had caused damage on campus. Against this backdrop, Jackson knew, or at minimum had actual access to information establishing, that the "sterilant" HES applied could be responsible for the tree discoloration SNU observed. His statement to Mr. Lester that he "did not know" the cause was therefore not an innocent lapse, but a materially false representation made in reckless disregard of facts within his direct professional responsibility.

223.    Furthermore, Mr. Jackson's omission was materially misleading because it deprived SNU of the ability to timely investigate and mitigate the injury, and it was made in reckless disregard of the truth and with intent to lull SNU into inaction.

224.    In June 2023 email exchanges, Mr. Pipp, HES's Vice President of Grounds Management, represented to SNU that a "sterilant" would be applied on campus but affirmatively withheld the product name despite knowing it was HYVAR XL, a federally restricted-use soil sterilant prohibited in landscaped settings. This omission was material because Pipp knew, or should have known, that disclosure of HYVAR's identity would have immediately alerted SNU to the substantial risk of tree death and permanent soil sterilization, and would have further revealed that application of HYVAR to a college campus was inconsistent with the product's EPA-approved labeling. By concealing this fact and using a vague generic term instead, Pipp materially misled SNU and prevented it from recognizing and objecting to the improper application before irreversible damage occurred.

225.    Moreover, HES had previously provided SNU with chemical application information for other products and time periods, demonstrating that it maintained such records in the ordinary course of business. Its selective refusal to provide records from June–July 2023, when HYVAR XL was applied, was deliberate concealment. This omission, coupled with Jackson's denial of knowledge, materially misled SNU and prevented timely mitigation.

226.    Upon information and belief, by early July 2023, HES had reason to know based on its own product knowledge, the warnings on HYVAR's EPA-approved label, crew

47

application reports, and visible early vegetation stress, that its application of HYVAR likely caused injury to SNU's property. Despite this knowledge, HES neither disclosed that fact nor corrected its prior representation; instead, through Mr. Jackson, it affirmatively represented that it "did not know" the cause of the tree discoloration.

227.    HES also took no reasonable remedial steps (e.g., warning SNU, cordoning affected areas, or providing application logs) to mitigate ongoing harm. HES's silence, coupled with an affirmative misstatement and failure to correct or warn, constituted fraudulent concealment of material facts uniquely within its knowledge and control.

228.    HES had a duty to disclose material chemical use both under its contract with SNU and under applicable federal and state law. The contract required HES to apply herbicides in compliance with labeling restrictions and to keep accurate records of its applications, while FIFRA and Oklahoma pesticide statutes imposed independent regulatory obligations of disclosure, licensing, and transparency. By withholding the product's identity and concealing the HYVAR XL applications, HES breached both contractual and statutory duties, making its omission not only misleading but also unlawful.

229.    In July and August 2024, Mr. Mendez, during meetings and communications with SNU officials, including on or about July 1, 2024, during an on-site meeting with T.J. Woodall, represented that HES had retained at least one outside expert and would provide a written report concerning tree damage. No such report was ever produced.

230.    In reliance on Mendez's assurance that a professional report would be provided, SNU deferred commissioning its own expert report for several weeks, during which the scope of injury worsened, and mitigation costs increased.

231. These communications with Mr. Mendez were collateral acts of fraud designed to mislead SNU about the true cause of ongoing environmental damage and to avoid liability. Such conduct occurred after contract performance (or lack thereof), in direct response to SNU's inquiries, and therefore lies outside the realm of mere nonperformance, constituting actionable fraud in its own right.

232. Moreover, as previously asserted, during the summer of 2024, while SNU was engaged in active negotiations concerning a possible extension of HES's custodial services agreement, Mendez's representations took on added significance. His assurances that HES had retained experts and would provide a written report on the tree damage were made not only to deflect accountability for the environmental injury but also to induce SNU to continue doing business with HES. By tying vague offers of financial assistance and promises of professional evaluation to the prospect of extending the custodial contract, HES used fraudulent misrepresentations as leverage in ongoing contract negotiations. SNU ultimately declined to renew the custodial portion of the contract, but the inducement underscores that HES's deception was deliberate, calculated, and undertaken for the specific business purpose of securing continued contractual relations with SNU, rather than an innocent or incidental misstatement.

233. In August 2024, HES dispatched its purported expert consultant, Mark Webber, to SNU's campus pursuant to Mr. Mendez's prior assurance that an outside expert had been retained and would provide a professional report on the tree damage. Webber acted at all times under HES's direction and authority, and his visit was presented as part of the promised "expert evaluation." Rather than producing a report or providing

meaningful transparency, Webber deflected inquiries by asking SNU to produce its own records and, when pressed about herbicide application information from HES, he initially did not respond and then directed SNU back to HES. Despite repeated follow-up requests, HES refused to provide its herbicide application records from the June–July 2023 timeframe, the critical period when HYVAR XL was applied. Neither Webber nor HES ever produced the promised expert report. Taken together, Mendez's false promise of expert evaluation and Webber's coordinated deflection were not isolated lapses, but a unified course of conduct deliberately designed to create the appearance of cooperation while concealing the very information SNU needed to identify and mitigate the chemical damage.

234.    Moreover, the communications, whether by Jackson, Pipp, Mendez, or Webber, affirmatively misstated the truth or omitted critical facts. Collectively, they concealed the fact that HYVAR XL had been applied and misled SNU about the true cause of the emerging damage. These misrepresentations and omissions were made knowingly, or at minimum with reckless disregard for the truth, and with the intent to conceal HES's misconduct, lull SNU into inaction, and avoid responsibility.

235.    HES alone possessed the definitive records of its herbicide applications, including the precise identity, quantity, and timing of chemicals applied on SNU's campus. Those records were never disclosed despite repeated requests. Because this information was uniquely within HES's control, SNU had no independent means of verification and necessarily relied on HES's representations and omissions. That reliance was both

reasonable and inevitable under the circumstances, and HES exploited it to conceal its misconduct and delay discovery of the true cause of the environmental injury.

236.    HES intended that SNU rely on the forementioned statements and omissions, and SNU did in fact reasonably rely by deferring further investigation, refraining from immediate mitigation, and continuing to allow HES to perform under the custodial-side of the contract. As a direct and proximate result, SNU suffered materially greater damages, including the loss of more than fifty mature trees, long-term soil sterilization, substantial remediation costs, and reputational harm.

237.    Oklahoma recognizes actionable fraud for affirmative misrepresentation or concealment of material facts (fraud by omission) where a duty to speak arises from circumstances, including exclusive knowledge; fraud must be shown by clear and convincing evidence. *Silk v. Phillips Petroleum Co.*, 1988 OK 93, ¶¶ 12–14, 33–34, 760 P.2d 174, 176–80.

238.    Here, unlike the arm's-length silence in *Silk*, HES affirmatively claimed it 'did not know' while later withholding the HYVAR product identity, MSDS/labeling, and the very application logs and promised 'outside expert' report that were exclusively within its control and repeatedly requested by SNU. That combination of an affirmative misstatement, refusal to release uniquely held, safety-critical information, and failure to correct or warn created a duty to speak under the 'peculiar circumstances' doctrine and supports fraudulent concealment.

239.    HES's fraudulent conduct was intentional, willful, and carried out with reckless disregard for SNU's rights. Accordingly, punitive damages are warranted under 23 O.S. § 9.1, in addition to full compensatory and consequential damages.

## COUNT VI – STATUTORY
## CLAIM FOR WRONGFUL INJURY TO TIMBER (23 O.S. § 72)

240.    Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

241.    Plaintiff seeks statutory damages pursuant to 23 O.S. § 72(A) in an amount of not less than three times, and up to ten times, the fair value of the timber and landscaping injured or destroyed because of Defendant's wrongful and unlawful herbicide application. This relief is remedial in nature, not punitive, and authorized by Oklahoma law as confirmed in *Sudbury v. Deterding*, 2001 OK 10, 19 P.3d 856 (Okla. 2001); *Short v. Jones*, 1987 OK 87, 613 P.2d 452 (Okla. 1987); *See also*, *Young v. Spencer*, 2017 OK CIV APP 58, 405 P.3d 701 (Okla. Ct. Civ. App. 2017).

242.    Defendant HES knowingly and unlawfully caused the injury, death, and destruction of over fifty mature hardwood trees and ornamental landscaping shrubs located on Plaintiff's Bethany, Oklahoma campus.

243.    These trees, which included oaks, maples, elms, pines, and redbuds are "timber" as defined by Oklahoma law under 2 O.S. § 16-2(12), formerly codified at 2 O.S. § 1301-102.

244.    2 O.S. § 16-2, defines timber to include "live and dead trees and the profit in any live and dead trees including, but not limited to, bark, foliage, wood, vines, firewood, crossties, and shrubbery."

245.    Defendant's actions, applying HYVAR (or another similar chemical), a federally restricted-use herbicide, in areas where its use is strictly prohibited, constitute a wrongful injury to timber within the meaning of 23 O.S. § 72(A). Defendant applied the herbicide in close proximity to trees, shrubs, and lawns in violation of its labeling and environmental regulations, resulting in irreversible harm to campus vegetation.

246.    The injury was neither casual nor involuntary, nor did Defendant act under any good faith belief that the land or vegetation belonged to it. On the contrary, Defendant had exclusive control over herbicide application under the parties' contract, and subsequently concealed its actions, failed to disclose application logs, and misrepresented or withheld information that could have mitigated the harm.

247.    As a direct and proximate result of Defendant's conduct, Plaintiff has suffered extensive damages, including the economic and sentimental loss of mature trees; degradation of soil and the surrounding ecosystem; the forced emergency removal of rotting trees to prevent safety hazards; aesthetic damage necessitating artificial remediation efforts such as painting dead grass to preserve campus appearance during key events; and an overall diminishment in the value, utility, and visual appeal of the university campus.

248.    Accordingly, Plaintiff is entitled to damages of *not less than three* (3) times and up to ten (10) times the amount necessary to compensate for the actual detriment caused by the wrongful injury to timber, pursuant to 23 O.S. § 72(A).

249.    Given that SNU has sustained direct and consequential damages estimated in excess of $1,000,000.00, including loss of mature trees, foliage, long term or permanent soil degradation, and campus-wide remediation efforts, the minimum statutory recovery under Oklahoma law exceeds $3,000,000.00.

250.    Plaintiff is also entitled to recover all costs and attorney's fees as the prevailing party under 23 O.S. § 72(B).

**WHEREFORE**, Plaintiff Southern Nazarene University respectfully requests that the Court enter judgment in its favor and against Defendant HES Facilities Management, LLC on this Count and award statutory damages of not less than three (3) times and up to ten (10) times the value of the timber injured as authorized by 23 O.S. § 72(A), together with reasonable attorney's fees and costs under 23 O.S. § 72(B), pre- and post-judgment interest as allowed by law, and such further and additional relief as the Court deems just and proper.

## COUNT VII – DECLARATORY RELIEF (28 U.S.C. §§ 2201–2202)

251.    Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

252.    An actual and justiciable controversy exists between the parties regarding the rights, duties, and legal obligations arising from the parties' contractual relationship and Defendant's application of federally regulated herbicides on Plaintiff's property.

253.    Specifically, Plaintiff contends, and is informed and believes, that Defendant HES violated applicable federal and Oklahoma law, including but not limited to, the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA), 7 U.S.C. § 136 *et seq*., and

Oklahoma statutes and regulations governing pesticide application, by improperly applying HYVAR X-L (or another similar chemical) in areas where its use is strictly prohibited and failing to disclose such use, in breach of its contractual and legal duties.

254.    Plaintiff SNU is presently engaged in remediation planning to evaluate whether contaminated soils must be excavated and replaced before replanting can safely occur. These efforts cannot proceed responsibly without clarity concerning Defendant HES's ongoing duty to disclose the full scope of its chemical applications and its liability for long-term remediation costs.

255.    Moreover, because the possible persistence of HYVAR's active ingredient creates an ongoing condition that directly impairs SNU's ability to remediate, restore, and safely use its property, declaratory relief is necessary now to resolve uncertainty and guide remediation planning. Without such relief, SNU faces immediate and continuing risk of incurring substantial costs without assurance of reimbursement or legal responsibility, leaving the parties in a state of ongoing dispute that damages alone cannot resolve.

256.    Declaratory relief under 28 U.S.C. § 2201 is independently appropriate because it will clarify the parties' ongoing legal relationship and eliminate uncertainty concerning (a) SNU's ability to replant and remediate safely; (b) HES's continuing duty to disclose material information; and (c) allocation of liability for ongoing contamination.

257.    Without such relief, SNU remains exposed to regulatory uncertainty, impaired future use of its campus, and further uncompensated harm. Declaratory judgment will serve a useful purpose in resolving this dispute and guiding the parties' future conduct, consistent with standards articulated by this Circuit.

**WHEREFORE**, Plaintiff Southern Nazarene University respectfully requests that the Court enter a declaratory judgment pursuant to 28 U.S.C. § 2201–2202 declaring the rights and obligations of the parties as set forth above, and award such further and additional relief as the Court deems just and proper.

## V. PRAYER FOR RELIEF

**WHEREFORE**, premises considered, Plaintiff Southern Nazarene University respectfully requests that this Court enter judgment in its favor and against Defendant HES Facilities Management, LLC as follows:

A. An award of actual and consequential damages in excess of $1,000,000.00 for the destruction of mature trees, permanent soil sterilization, loss of landscaped green space, emergency remediation measures, reputational injury, and other losses directly resulting from Defendant's wrongful conduct, with the precise amount to be determined at trial;

B. Punitive damages in an amount sufficient to punish Defendant for its willful, wanton, reckless, and fraudulent acts, and to deter similar future misconduct, pursuant to 23 O.S. § 9.1;

C. Statutory treble damages as authorized by 23 O.S. § 72(A), in an amount not less than three (3) times actual damages for the wrongful injury and destruction of Plaintiff's timber and vegetation;

D. Declaratory relief under 28 U.S.C. § 2201, declaring that Defendant's use of HYVAR XL (or another similar chemical) was unlawful and in breach of contractual and regulatory obligations; that Defendant is liable for all past, present, and future damages, remediation, and restoration costs; and that Defendant must fully disclose the identity, quantity, timing, and location of all chemicals applied to Plaintiff's property;

E. For pre- and post-judgment interest as provided by law;

F. For all costs of this action, including reasonable attorney's fees where applicable; and,

G.  An award of all recoverable costs and reasonable attorney's fees, including those provided by statute, contract, or applicable law; and

H.  For such other and further relief as the Court deems just and proper.

DATED: this 31st day of August 2025.

Respectfully submitted,

s/ Travis Vernier

TRAVIS VERNIER, OBA NO.: 35253
LES BENNETT, JR., OBA NO.: 32352
AUSTIN VERNIER, OBA NO.: 35759
AUSTIN PROCTOR, OBA NO.: 31418
BENNETT VERNIER, PLLC
6116 Northwest 63rd Street
Warr Acres, Oklahoma 73132
Telephone: (405) 346-9800
Email: info@bennettvernier.com
*ATTORNEYS FOR PLAINTIFF SNU*

ATTORNEY LIEND CLAIMED.

## CERTIFICATE OF SERVICE

I hereby certify that on the 31st day of August 2025, I electronically transmitted the foregoing to the Court Clerk using the ECF System for filing and transmittal of a Notice of Electronic Filing to all counsel of record who are registered participants.

s/ Travis Vernier

TRAVIS VERNIER

57